E-FILED
Monday, 27 March, 2023  10:58:36 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **BRICKLAYERS LOCAL 8 OF ILLINOIS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **No. 21-cv-3273** |
| | ) | |
| **WESTERN WATERPROOFING COMPANY, INC., et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. District Judge.**

This is an action to compel arbitration pursuant to Section 301 of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185.  The parties—a labor union, a contractor, and a subcontractor—are involved in renovating the Willard Ice Building, a government office building in Springfield.  The renovation is governed by a project labor agreement (PLA), to which all the parties here are signatories.  The PLA also incorporates the participating unions' collective bargaining agreements (CBAs).

In the summer of 2021, Plaintiff Bricklayers Local 8 of Illinois filed two grievances with the Illinois AFL-CIO, the umbrella labor organization charged with administering the PLA.  The Bricklayers claimed that Defendant Western Waterproofing Company—one of the project's prime contractors—improperly subcontracted installation work to Defendant Vector Construction without abiding by the terms of the Bricklayers' CBA.

The Bricklayers initially sought to resolve their claims under the PLA.  The AFL-CIO, however, concluded that the dispute must be resolved under the Bricklayers' CBA.  But when the Bricklayers tried to proceed accordingly, Western and Vector refused to participate.  Western and Vector maintained, and continue to maintain, that only the PLA governed the Bricklayers' claims.  The Bricklayers then brought this Section 301 suit to compel Western and Vector to arbitrate the grievances under the CBA.

This matter comes before the Court on the parties' cross-motions for summary judgment.  See d/e 25; d/e 26; d/e 27.  With no material facts in dispute, the Court finds that the Bricklayers' grievances are arbitrable under the CBA.  The Bricklayers' motion is GRANTED, and Western and Vector's motions are DENIED.

# I.  BACKGROUND

The Court draws the following facts from the parties'
statements of undisputed facts and the evidence they submitted.
The Court deems admitted any facts not in dispute or disputed
without an evidentiary basis.  See L.R. 7.1(D)(2)(b)(2).

Plaintiff Bricklayers Local 8 of Illinois is a labor union and a
local affiliate of the Bricklayers and Allied Craftworkers
International Union.  Defendants Western Waterproofing Company
and Vector Construction are construction contractors.  The
Bricklayers are a "labor organization," and Western and Vector are
"employers," as those terms are defined in 29 U.S.C. § 185.

## A.    The PLA.

In 2019, the Illinois Capital Development Board began
soliciting bids for a planned renovation of the Willard Ice Building in
Springfield, Illinois.  That November, the Bricklayers and fourteen
other labor unions entered a project labor agreement (PLA) with the
Capital Development Board.  See Pl.'s Mot. Summ. J. ex. 2
(hereafter "PLA"), d/e 26-2, at 1.  The unions contracted with the
Capital Development Board under the auspices of the Illinois AFL-
CIO Building Trades, an umbrella labor organization.  Id.

The PLA governs the work done by three groups: "Unions," "Prime Contractors," and "Subcontractors." See id. The PLA applies to all "Construction Work . . . to be performed by Prime Contractor(s) and all Subcontractors" during the renovation project. Id. Among other things, the PLA requires that participating Prime Contractors and Subcontractors execute a "Contractor Letter of Assent . . . prior to commencing Construction Work on the Project." Id. § 1.2. Any Prime Contractor or Subcontractor who does so is "thereafter . . . deemed a party to the PLA." Id. § 1.3. Western and Vector executed their letters of assent on May 6, 2021.

Article I of the PLA sets forth the agreement's "Intent and Purposes." Article I also incorporates the signatory unions' collective bargaining agreements (CBAs). See id. § 1.6. (noting the signatories' "intent to respect the provisions of any other collective bargaining agreements that may now or hereafter pertain"). The "terms of each applicable collective bargaining agreement as determined in accordance with paragraph 1.6 are incorporated [into the PLA] by reference." Id. § 1.7. By signing their letters of assent, Western and Vector agreed:

> to be bound and abide by the terms of the following in order of precedence: (a) the applicable collective bargaining agreement between the Prime Contractor and one or more of the Unions made signatory hereto; (b) the applicable collective bargaining agreement between a Subcontractor and one or more of the Unions made signatory hereto; or (c) the current applicable area collective bargaining agreement for the relevant Union that is the agreement certified by the Illinois Department of Labor for purposes of establishing the Prevailing Wage applicable to the project.

Id. § 1.6.  If there is a "variance or conflict, whether explicit or implicit," between the PLA and the incorporated CBAs, the PLA "supersede[s] and control[s]."  Id. § 1.7.

The PLA includes two discrete dispute-resolution procedures. The first of these procedures, set forth in Article V, applies to disputes "arising under a particular collective bargaining agreement."  Id. § 5.  Article V provides, by reference to the incorporated collective bargaining agreements, that:

> In the event a dispute arises under a particular collective bargaining agreement specifically not including jurisdictional disputes referenced in Article VI below, said dispute shall be resolved by the Grievance/Arbitration procedure of the applicable collective bargaining agreement.  The resulting determination from this process shall be final and binding on all parties bound to its process.

Id. § 5.1 (emphasis added).

The second procedure applies exclusively to disputes within the subject-matter confines of the PLA.  As set forth in Article VI, the PLA's "Jurisdictional Dispute Resolution Process" covers "jurisdictional disputes between and among Contractors, Subcontractors, and Unions."  Id. § 6.3; see also id. § 6.7 ("The primary concern of the Process shall be the adjustment of jurisdictional disputes arising out of the Project.").  Article VI provides that the "Process will be followed for any grievance or dispute arising out of the interpretation or application of this PLA by the parties."  Id. § 6.3.  "All decisions made through the Process are final and binding upon all parties."  Id.

The Process requires that participating parties take several preliminary measures before a jurisdictional grievance may be arbitrated.  Article VI provides that:

> In the event of a dispute relating to trade or work jurisdiction, all parties, including the employers, Contractors or Subcontractors, agree that a final and binding resolution of the dispute shall be resolved as follows:
>
> (a) Representatives of the affected trades and the Contractor or Subcontractor shall meet on

the job-site within two (2) business days after
receiving written notice in an effort to resolve
the dispute. (In the event there is a dispute
between local Unions affiliated with the same
International Union, the decision of the General
President, or his/her designee, as the internal
jurisdictional authority of that International
Union, shall constitute a final and binding
decision and determination as to the
jurisdiction of work.)

(b) If no settlement is achieved subsequent to
the preceding Paragraph, the matter shall be
referred to the local area Building &
Construction Trades Council, which shall meet
with the affected trades within two (2) business
days subsequent to receiving written notice. In
the event the parties do not wish to avail
themselves of the local Building & Construction
Trades Council, the parties may elect to invoke
the services of their respective International
Representatives with no extension of the time
limitations. An agreement reached at this Step
shall be final and binding upon all parties.

Id. § 6.6.  If the parties cannot resolve their dispute at either of

these steps, "the matter shall be immediately referred to the Illinois

Jurisdictional Dispute Process for final and binding resolution of

said dispute" through arbitration.  Id. § 6.6(c).

The Process contemplates an eight-step arbitration procedure.

As specified in Article VI, the "Order of Presentation in all Hearings

before an Arbitrator" includes the following:

I.    Identification and Stipulation of the Parties
II.   Union(s) claiming the disputed work presents its case
III.  Union(s) assigned the disputed work presents its case
IV.   Employer assigning the disputed work presents its case
V.    Evidence from other interested parties (i.e., general contractor, project manager, owner)
VI.   Rebuttal by Union(s) claiming the disputed work
VII.  Additional submissions permitted and requested by Arbitrator
VIII. Closing arguments by the parties[.]

Id. § 6.12.

Article VI assigns the task of administering the Process to "the offices of the President and/or Secretary-Treasurer of the Illinois AFL-CIO, or their designated representative, called the Administrator."  Id. § 6.4.  The Administrator's role is limited to determining whether a particular dispute falls within the Process's ambit.  "If at any time there is a question as to the jurisdiction" of the Process, the Administrator "may participate in proceedings seeking a declaration or determination that the underlying dispute is subject to the jurisdiction" of the Process.   Id. § 6.15.

**B.    The CBA.**

The Bricklayers operate under an areawide CBA with the members of the Central Illinois Mason Contractors Association (CIMCA).  See Pl.'s Mot. Summ. J. ex. 3 (hereafter "CBA"), d/e 26-3, at 3.  The CBA sets forth the terms and conditions of masonry and bricklaying employment for more than thirty counties in central Illinois.  Western is a signatory to the CBA.  Vector is not.

Article II of the CBA delineates the Bricklayers' craft jurisdiction as encompassing "all Bricklayers, Stonemasons, Terrazzo Workers, Tile Setters, Tile Helpers, Tuck Pointers, Cement Finishers, Plasterers and BAC Marble Masons work," as defined in the Bricklayers' Constitution.  See id. § 2.3.  Article XVII of the CBA prohibits signatory employers from contracting or subcontracting protected work to non-signatories.  Article XVII provides that:

> The Employer agrees not to subcontract out any BAC work to be done at the site of construction, alteration, painting or repair of a building, structure or other work except to a person, firm or corporation who observes the same wages, hours, and terms and conditions of this Agreement.   The furnishing of materials, supplies or equipment and the delivery thereof shall in no case be considered as subcontracting.

Id. § 17.1.

Much like the PLA, the CBA contains two discrete dispute-resolution and arbitration procedures.  The first of these, set forth in Article XII, applies to jurisdictional disputes.  Article XII defines a jurisdictional dispute as one "involving the assignment of particular work to one class or craft of employees rather than to a different class or craft of employees, regardless of that Employer's contractual relationship to any other Employer, Contractor, or Organization on the site."  Id. § 12.1.  "In the event of any dispute involving craft jurisdiction," Article XII requires that the assigning employer "convene a meeting with [the competing unions'] representatives for the purpose of attempting to resolve such dispute among the affected parties."  Id. § 12.2.  If the dispute cannot be resolved informally, "it shall be settled in accordance with International and Local Union Representative."  Id. § 12.3.

The second dispute-resolution process is set forth in Article XIII and bears the title "Grievance Procedure."  Article XIII applies to "all grievances and disputes," save for jurisdictional disputes," "non-payment of wages," and "fringe benefits."  Id. § 13.1.  Article XIII calls for union-employer grievances to be processed first

through an informal job-site meeting.  Id. § 13.2(a).  If that meeting

does not resolve the dispute, the "matter shall then be submitted in

writing . . . to the Field Representative or President of the Union

and a representative of the Employer, who shall be selected by the

employer to act on such grievance."  Id. § 13.2(b).  And if "such

complaint or grievance shall not have been satisfactorily settled"

after either of these steps, the parties may submit the matter "to an

arbitration committee of three . . . for final decision."  Id. at 14.

Article XIII requires that one arbitrator "shall be selected by and

represent[] the Union," another arbitrator "shall be selected by and

represent[] the Employer," and that these arbitrators "select a third

impartial member who shall act as a Chairman."  Id. at 14–15.  The

"decision of the committee shall be final and binding on both

parties."  Id. at 15.

## C.    The Bricklayers' Grievances.

On August 19, 2021, the Bricklayers filed a grievance against

Vector pursuant to Article VI of the PLA.  The grievance alleged that

Vector was performing work covered by the Bricklayers' CBA

without becoming a signatory to the CBA.  As required by Article VI,

the Bricklayers and Vector held a job-site meeting to discuss the

grievance.  <u>Cf.</u> PLA § 6.6(a).  The parties then referred the matter to the Central Illinois Building Trades Council for a second meeting. <u>Cf.</u> PLA § 6.6(b).  Neither meeting resolved the parties' dispute.

On September 9, 2021, the Bricklayers requested that the Illinois AFL-CIO—the PLA's designated Administrator—process their grievance for arbitration.  <u>Cf.</u> PLA § 6.6(c).  The AFL-CIO rejected the Bricklayers' request.  <u>See</u> Drea Aff., d/e 26-12.  In the AFL-CIO's view, Article VI provided a "grievance and arbitration procedure applicable to disputes between two unions over work jurisdiction."  <u>Id.</u> ¶ 3.  Because the Bricklayers' grievance "did not involve a dispute between two labor organizations," <u>id.</u> ¶ 7, the AFL-CIO concluded that the grievance "must be processed pursuant to [the Bricklayers'] collective bargaining agreement," <u>id.</u> ¶ 9.

On September 20, 2021, the Bricklayers filed a grievance against Vector under Article XIII of the CBA.  The Bricklayers alleged that Vector violated the CBA "by failing to abide by its terms on the Project, including the payment of appropriate wages and fringe benefit contributions to individuals performing covered work." <u>See</u> Vector's Resp. to Pl.'s Mot. Summ. J., d/e 28, at 4.  Vector has

refused to arbitrate the Bricklayers' grievance against it, claiming that the grievance only can be arbitrated under the PLA.

The Bricklayers filed a parallel grievance against Western the same day.  This grievance alleged that Western "violated Article XVII of the Collective Bargaining Agreement by subcontracting covered work to defendant Vector."  <u>See</u> Western's Resp. to Pl.'s Mot. Summ. J., d/e 31, at 3.  Like Vector, Western refused to arbitrate under the CBA.  Western similarly maintains that the Bricklayers' grievance is covered by the PLA and, therefore, must be arbitrated according to Article VI of the PLA.

The Bricklayers then brought this lawsuit under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. <u>See</u> Compl, d/e 1.  In Count I, the Bricklayers seek to compel Vector to arbitrate the September 20, 2021, grievance under the Bricklayers' CBA.  In Count II, the Bricklayers request the same relief as to their September 20, 2021, grievance with Western.  The Bricklayers also seek attorneys' fees and costs.

The parties now move for summary judgment.  <u>See</u> Vector's Mot. Summ. J., d/e 25; Pl.'s Mot. Summ. J., d/e 26; Western's Mot. Summ. J., d/e 27.

## II. JURISDICTION AND VENUE

The Bricklayers brought this labor-relations action pursuant to 29 U.S.C. § 185. This Court, therefore, has federal-question jurisdiction over the Bricklayers' claims. See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). Venue is proper because a substantial part of the events or omissions giving rise to the Bricklayers' claims occurred within this District. See 28 U.S.C. § 1391(b).

## III. LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of any genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party. Carroll v. Lynch, 698 F.3d 561, 564 (7th Cir. 2012).

At summary judgment, the Court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. Woodruff v. Mason, 542 F.3d 545, 550 (7th Cir. 2008). Similarly, in ruling on cross-motions for summary judgment, the Court views "all facts and inferences in the light most favorable to the nonmoving party on each motion." Lalowski v. City of Des Plaines, 789 F.3d 784, 787 (7th Cir. 2015).

### IV. DISCUSSION

The Bricklayers seek to compel Western and Vector to arbitrate. Under the Federal Arbitration Act, a court may compel arbitration if (1) there exists a written agreement to arbitrate, (2) the parties' dispute lies within the scope of that agreement, and (3) at least one party has refused to arbitrate. See 9 U.S.C. § 4. As all agree, the third element is satisfied here.

Arbitration "is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986). The Court has "no business weighing the merits of the [underlying] grievance, considering whether there is equity in a particular claim, or determining

whether there is particular language in the written instrument which will support a claim." Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 568 (1960). But the "question of arbitrability—whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination." AT&T Techs., 475 U.S. at 649. "In order to interpret" the PLA and the CBA, "it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements." Transportation-Commc'n Emp. Union v. Union Pac. R. Co., 385 U.S. 157, 161 (1966).

Two questions of arbitrability arise here. The first is "whether the parties are bound by a given arbitration clause." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002) (citations omitted). Neither Western nor Vector contests that it is bound by the PLA and its dispute-resolution procedures. Instead, Vector argues that—given its non-signatory status—it cannot be compelled to arbitrate under the Bricklayers' CBA. In the Bricklayers' view, however, Vector assented to the CBA when it assented to the PLA.

The second question is "whether an arbitration clause in a . . . binding contract applies to a particular type of controversy." Id.  In this case, both Western and Vector contend that the Bricklayers' grievances must be arbitrated according to the PLA's Jurisdictional Dispute Resolution Process.  The Bricklayers, on the other hand, say that the Process applies solely to jurisdictional disputes between unions and that only the CBA's dispute-resolution mechanisms cover the Bricklayers' subcontracting grievances.

The Bricklayers are correct on both points.  They are, therefore, entitled to summary judgment on Counts I and II.

**A.  Western and Vector Are Bound by the Arbitration Provisions of Both the PLA and the CBA.**

The Court turns first to the question whether Western and Vector "are bound by a given arbitration clause." Howsam, 537 U.S. at 84.  The parties agree that they are bound by the arbitration clause in Article VI of the PLA.  And while Western disputes that the CBA's dispute-resolution procedures cover the Bricklayers' grievances, Western concedes it is bound by the CBA nonetheless.  But Vector insists that, as a non-signatory, it cannot be made to arbitrate under the CBA.  The Court concludes otherwise.

Arbitration is generally "a creature of contract."  <u>Dunmire v. Schneider</u>, 481 F.3d 465, 467 (7th Cir. 2007).  Just as non-signatories to contracts may be bound to them, non-signatories to arbitration agreements equally may be bound to arbitrate.  <u>See, e.g.</u>, <u>Thomson–CSF, S.A. v. American Arbitration Association</u>, 64 F.3d 773, 777 (7th Cir. 1995).  This Circuit recognizes "five doctrines through which a non-signatory can be bound by arbitration agreements entered into by others: assumption, agency, estoppel, veil piercing, and incorporation by reference."  <u>Zurich Am. Ins. Co. v. Watts Indust., Inc.</u>, 417 F.3d 682, 687 (7th Cir. 2005) (citation omitted).

The applicable doctrine here is incorporation by reference, for the PLA clearly incorporates the Bricklayers' CBA.  By signing a letter of assent to the PLA, Vector agreed:

> to be bound and abide by the terms of the following in order of precedence: (a) the applicable collective bargaining agreement between the Prime Contractor and one or more of the Unions made signatory hereto; (b) the applicable collective bargaining agreement between a Subcontractor and one or more of the Unions made signatory hereto; or (c) the current applicable area collective bargaining agreement for the relevant Union that is the agreement certified by the Illinois Department of Labor for

purposes of establishing the Prevailing Wage applicable to the project.

PLA § 1.6.  Even if this provision bore some ambiguity, the very next provision would resolve any doubt: "Subject to the limitations of paragraphs 1.4 to 1.6 of this Article, the terms of each applicable collective bargaining agreement as determined in accordance with paragraph 1.6 are incorporated by reference."  Id. § 1.7.  Moreover, the PLA expressly imports the dispute-resolution procedures of its incorporated CBAs.  If "a dispute arises under a particular collective bargaining agreement specifically not including jurisdictional disputes referenced in Article VI," Article V directs the parties to resolve it "by the Grievance/Arbitration procedure of the applicable collective bargaining agreement."  Id. § 5.1.

In sum, the PLA incorporates all non-conflicting provisions of the Bricklayers' CBA, including the CBA's dispute-resolution and arbitration procedures.  Vector assented to the PLA in whole, not in part.  Accordingly, Vector is bound both by the Bricklayers' CBA and by its constituent arbitration clause.

**B.   The Bricklayers' Grievances Are Not Arbitrable Under the PLA.**

Next, the Court considers whether the AFL-CIO was wrong to find that the Bricklayers' grievances were not arbitrable under the PLA.  The gravamen of Western and Vector's motions for summary judgment is that the AFL-CIO erred in reaching that conclusion.  The Court disagrees.  The Court instead finds, "with positive assurance," that the PLA's arbitration provisions are "not susceptible of an interpretation that covers the asserted dispute."  AT&T Techs., 475 U.S. at 649.

**1. The Bricklayers' grievances raise a subcontracting dispute, not a jurisdictional dispute.**

The Court first queries how best to classify the Bricklayers' grievances.  The Bricklayers allege that Western subcontracted certain work to Vector's non-union employees.  The Bricklayers further allege that this work was, under their CBA, expressly reserved for them.  Because not all labor disputes require the same processes, "determining the character of [the Bricklayers' grievances] . . . necessarily determines the arbitrability of the dispute."  Hutter Const. Co. v. Int'l Union of Operating Engineers, Loc. 139, AFL-CIO, 862 F.2d 641, 644 (7th Cir. 1988).  This

question "is, therefore, undeniably an issue for judicial determination." Id.

A jurisdictional dispute is one "between two or more groups of employees over which [group] is entitled to do certain work for an employer." Id. at 644. "[B]y definition," jurisdictional disputes "cannot exist unless there are rival claims to the work." N.L.R.B. v. Plasterers' Loc. Union No. 79, Operative Plasterers' & Cement Masons' Int'l Ass'n, AFL-CIO, 404 U.S. 116, 134 (1971); see also Brock Indus. Servs., LLC v. Laborers' Int'l Union of N. Am. Constr. & Gen. Laborers Loc. 100, 920 F.3d 513, 516 (7th Cir. 2019) (". . . the Laborers complained (and the Subcommittee found) that Brock assigned work to the wrong union. That's the definition of a jurisdictional dispute."). A subcontracting dispute, by contrast, arises when "an employer subcontracts a part of the union's work to another employer that does not hire that union's employees." Int'l Union of Operating Eng'rs, Loc. 103 v. Indiana Constr. Corp., 910 F.2d 450, 453 (7th Cir. 1990). Put differently, where a jurisdictional dispute places an employer "in a cross-fire between two unions," Laborers' Int'l Union v. W.W. Bennett Constr. Co., 686

F.2d 1267, 1272 (7th Cir. 1982) (cleaned up), a subcontracting

dispute places a union and an employer squarely in opposition.

The line between a jurisdictional dispute and a subcontracting

dispute can be fine.  Not so here.  The NLRB "has specifically held

that if a dispute is fundamentally over the preservation, for one

group of employees, of work they have historically performed, it is

not a jurisdictional dispute."  Int'l Ass'n of Machinists & Aerospace

Workers, Dist. 190, Loc. Lodge 1414, 344 N.L.R.B. 1018, 1020

(2005).  Circuit law draws precisely the same distinction.  E.g.,

Brock, 920 F.3d at 516–20 (collecting cases).  There is no dispute

that the Bricklayers' quarrel lies with the assignment of work to a

non-union shop rather than the assignment of work to another

union.  The "real nature of this dispute," therefore, "is to retrieve

jobs that were subcontracted, not to acquire new work."  Elec.

Workers Loc. 103 (T Equip. Corp.), 298 N.L.R.B. 937, 940 (1990).

This means that the Bricklayers' grievances relate not to

jurisdiction but to subcontracting.

## 2. As the AFL-CIO validly determined, subcontracting disputes are not arbitrable under Article VI of the PLA.

With this classification in mind, the Court considers whether Bricklayers' subcontracting grievances are arbitrable under Article VI of the PLA, which sets forth the PLA's "Jurisdictional Dispute Resolution Process."  Western and Vector say they are.  But this argument runs counter to the AFL-CIO's binding determination of its arbitral jurisdiction and the clear language of the PLA itself.

Contracting parties "may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by clear and unmistakable evidence."  Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 530 (2019) (citing Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 69–70 (2010)).  A "robust delegation clause conferring power" to a neutral suffices as clear and unmistakable evidence of such a delegation.  See, e.g., Nandorf, Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc., 410 F. Supp. 3d 882, 888 (N.D. Ill. 2019) (citing Rent-A-Center, 561 U.S. at 72).  Here, Article VI provides that the "Illinois Jurisdictional Dispute Resolution Process will be followed for any grievance or dispute arising out of the interpretation or application

of this PLA by the parties." PLA § 6.3. The ensuing provision assigns "[a]dministrative functions under the Process" to "the offices of the President and/or Secretary-Treasurer of the Illinois AFL-CIO, or their designated representative, called the Administrator." Id. § 6.4. "If at any time there is a question as to the jurisdiction of the . . . Process," either the arbitrator or the Administrator may "establish[] its jurisdiction." Id. § 6.15. All of this is clear and unmistakable evidence that, under the PLA, questions of arbitrability are for the arbitrator and the AFL-CIO.

Moreover, the arbitrability question raised here already has been asked and answered. The AFL-CIO determined that the Bricklayers' grievances fell outside Article VI's arbitral scope and, pursuant to Article V, must be resolved under the Bricklayers' CBA. The Court defers to that determination. When an arbitration clause "encompasses disputes over the scope or validity of the contract in which it is embedded, issues of the contract's scope or validity are for the arbitrators." Air Line Pilots Ass'n v. Moffat, 279 F.3d 553, 556 (7th Cir. 2002). And because the Administrator "is designed to function in essence as the parties' surrogate, he cannot 'misinterpret'" his enabling document. See Stead Motors of Walnut

<u>Creek v. Auto. Machinists Lodge No. 1173, Int'l Ass'n of Machinists</u> <u>& Aerospace Workers</u>, 886 F.2d 1200, 1205 (9th Cir. 1989); <u>see</u> <u>generally</u> 20 Williston on Contracts § 56:26 (4th ed.).

Nevertheless, Western says that the Bricklayers need only "clarify to the AFL-CIO that its dispute with Western or Vector is not a jurisdictional dispute between two unions" to proceed to arbitration under Article VI of the PLA.  <u>See</u> Western's Resp. to Pl.'s Mot. Summ. J., d/e 31, at 10.  Yet the PLA's Jurisdictional Dispute Resolution Process—in name and in structure—forecloses Western's position.

Circuit law recognizes that jurisdictional disputes and subcontracting disputes demand different arbitral forums.  <u>Hutter</u> <u>Constr. Co. v. Int'l Union of Operating Eng'rs, Loc. 139, AFL–CIO</u>, 862 F.2d 641 (7th Cir. 1988) (noting, as a general matter, that claim of violation of subcontracting clause does not give rise to jurisdictional dispute); <u>see also</u> <u>Mascaro Constr. Co., L.P. v. Loc.</u> <u>Union No. 210</u>, 2009 WL 1405858, at *4 (W.D.N.Y. May 15, 2009) (same).  Ordinarily, a jurisdictional dispute is resolved through tripartite arbitration.  In a tripartite arbitration, one union argues that certain work properly belongs to them; another union claims

that the contested work properly was assigned to them; and the
assigning employer weighs in one way or the other.  See, e.g.,
Brock, 920 F.3d at 516 (jurisdictional dispute "required tripartite
arbitration in which the competing unions and the employer could
be heard").  A subcontracting dispute, on the other hand, involves
only two parties—a union and an employer—and so requires
bipartite arbitration.  See, e.g., Alberici-Eby v. Loc. 520, Int'l Union
of Operating Eng'rs, 992 F.2d 727, 733 (7th Cir. 1993) (employer's
"failure to assign . . . work solely and exclusively to the Operating
Engineers" required bipartite arbitration).

Despite Western and Vector's argument to the contrary, the
disputes at issue here simply are incompatible with Article VI's
arbitral structure.  The Jurisdictional Dispute Resolution Process
was not so named without reason.  The Process was designed to
resolve jurisdictional disputes between competing unions.  See PLA
§ 6.7 ("The primary concern of the Process shall be the adjustment
of jurisdictional disputes arising out of the Project.").  And it
culminates in a tripartite arbitration at which three parties—the
"Union(s) claiming the disputed work," the "Union(s) assigned the
disputed work," and the "Employer assigning the disputed work"—

must formally "present" their cases.  Id. § 6.12.  Here, there is no
"Union[] assigned the disputed work" to defend its position.  That
leaves no need for a forum "in which . . . competing unions and the
employer [can] be heard."  Brock, 920, F.3d at 516 (emphasis
added).  Even if the AFL-CIO's determination were not owed near-
total deference, it still would stand on its own merits.

Federal courts must compel arbitration of a grievance "unless
it can be said with positive assurance that the arbitration clause is
not susceptible of an interpretation that covers the asserted
dispute."  AT&T Techs., 475 U.S. at 649.  That exception obtains
here.  The Court concludes that the Bricklayers' grievances are not
arbitrable under Article VI of the PLA, and so Western and Vector's
motions for summary judgment must be denied.

## C.  The Bricklayers' Grievances Are Arbitrable Under the CBA.

Having disposed of Western and Vector's motions—and Article
VI of the PLA—the Court lastly turns to the Bricklayers' motion for
summary judgment.  The Bricklayers seek to arbitrate their
grievances under their CBA's dispute-resolution procedures, which
arguably encompass the subject-matter of the parties' dispute.  The
Court has found that both Western and Vector are bound by those

procedures and that the PLA provides an inapposite arbitral forum for the Bricklayers' grievances.

The PLA requires that its parties resolve their non-jurisdictional grievances "by the Grievance/Arbitration procedure of the applicable collective bargaining agreement."  PLA § 6.12.  The applicable CBA here, of course, is the Bricklayers' CIMCA CBA, which sets forth its "Grievance Procedure" at Article XIII.  Article XIII contains a broad arbitration provision: It calls for bipartite arbitration of "all grievances and disputes" related to the Bricklayers' employment, except for "jurisdictional disputes," claims of "non-payment of wages," and disputes regarding "fringe benefits." See CBA § 13.1.  Article XIII quite fairly can be read to encompass the subject matter of the parties' subcontracting dispute.  Moreover, and as the Court has discussed at some length, the bipartite arbitration for which Article XIII calls is the usual means of resolving a subcontracting dispute.

All this is to say that the Court need go no further.  "[O]nce it is clear the parties have a contract that provides for arbitration of some issues between them, any doubts concerning the scope of the arbitration clause are resolved in favor of arbitration."  Miller v.

Flume, 139 F.3d 1130, 1136 (7th Cir. 1998).  And once a court has "determined that the underlying dispute concerns a subject matter covered by arbitration provisions, the court's only role is to order arbitration."  Niro v. Fearn Int'l, Inc., 827 F.2d 173, 176 (7th Cir. 1987).   The Court finds that the Bricklayers' grievances are arbitrable under the Bricklayers' CBA.  The parties, therefore, shall arbitrate the grievances pursuant to the CBA.  "That is all [this Court] need and should decide."  Id.

## D. The Court Reserves Ruling on the Question of Attorneys' Fees.

Lastly, the Bricklayers ask this Court to award them attorneys' fees.  Such an award is appropriate only if Western and Vector's positions were "frivolous, which our cases define to mean brought in bad faith—brought to harass rather than to win."  Loc. 232, Allied Indus. Workers of Am., AFL–CIO v. Briggs & Stratton Corp., 837 F.2d 782, 789 (7th Cir. 1988) (citation omitted).

The parties' summary-judgment briefing on this issue is undeveloped.  The Court, therefore, shall reserve ruling on the question and await supplemental briefing.

# V. CONCLUSION

For these reasons, Plaintiff's Motion for Summary Judgment, see d/e 26, is GRANTED IN PART and RESERVED IN PART. Defendants' Motions for Summary Judgment, see d/e 25; d/e 27, are DENIED.  Judgment shall enter in Plaintiff's favor on Counts I and II of Plaintiff's Complaint to Compel Arbitration.

**IT IS FURTHER ORDERED THAT:**

1.  The parties are DIRECTED to submit the September 20, 2021, grievances to arbitration in accordance with Article XIII of the CIMCA CBA.

2.  The parties are DIRECTED to file, by no later than April 7, 2023, supplemental briefs concerning Plaintiff's prayer for attorneys' fees (d/e 1).  The briefs shall be no longer than five pages.

3.  The Court shall maintain jurisdiction over this matter pending its resolution through arbitration.

**IT IS SO ORDERED.**

**ENTERED: MARCH 27, 2023**

**FOR THE COURT:**

_s/Sue E. Myerscough_
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**